**GENERAL ELECTRIC COMPANY,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–172C.**

United States Court of Federal Claims.

Oct. 24, 2008.

Richard D. Bernstein, Washington, DC, for plaintiff. Howard Stanislawski, Washington, DC, and Alan C. Brown, McLean, VA, of counsel.

C. Coleman Bird, Washington, DC, with whom were Acting Assistant Attorney General Gregory G. Katsas, Director Jeanne E. Davidson, and Assistant Director Kirk T. Manhardt, for defendant. Stephen R. Dooley, Defense Contract Management Agency, Washington, DC, of counsel.

---

## OPINION

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for partial summary judgment regarding the proper interest rate to be used to calculate a segment-closing adjustment under Cost Accounting Standard ("CAS") 413.50(c)(12) ("CAS 413"), 48 C.F.R. § 9904.413–50(c)(12) (1993).[1] This is the fourth decision in this case regarding GE's 1993 sale of the GE Aerospace ("GEA") business segment to Martin Marietta Corporation ("Martin Marietta" or "MMC"), now known as Lockheed Martin.[2] At issue in these pending cross-motions is what interest rate assumption a contractor with a fully-funded pension plan must use to perform the CAS 413 segment-closing calculation.

Both parties agree that the contractor must apply the interest rate assumptions required under CAS 412.40(b)(2) (the "CAS 412 rate"), 48 C.F.R. § 9904.412–40(b)(2) (1993), for the CAS 413 calculation.[3] However, the parties disagree over the appropriate CAS 412 interest rate assumption for over-funded pension plans. The government contends that for contractors with over-funded pension plans, such as GE, the CAS 412 rate, as a matter of law, must be identical to the interest rate identified by the contractor on its financial disclosure statements under Financial Accounting Standard No. 87 ("FAS 87")

as the pension plan's expected long-term rate of return ("FAS 87 LTR"). GE disagrees and argues that, as a matter of law, the FAS 87 LTR is based on different criteria and serves different purposes than the CAS 412 rate and that the CAS 412 rate should be the same as the rate used by the contractor to calculate its minimum funding obligation under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001–1461 (1993). Under the government's approach, GE would be required to use its 1993 FAS 87 LTR of 9.5% for its CAS 413 segment-closing calculation. Under GE's approach, GE would be allowed to use its 1993 8% ERISA rate, which it adopted for that year as its CAS 412 rate, for its CAS 413 segment-closing calculation.

For the reasons that follow, the court agrees with GE and concludes that GE may properly rely upon its 8% ERISA/CAS 412 rate for purposes of its CAS 413 segment-closing calculation.

## BACKGROUND

### A. Facts and Regulatory Background

The following facts are not in dispute. Since early in the twentieth century, GE has maintained a pension plan for its employees, known as the GE Pension Plan ("GEPP"). The GEPP is a qualified defined-benefit pen-

---

1. CAS 413 was substantially revised in 1995. All of the contracts at issue in this case predate these changes. As such, the segment closings in this case are governed by the original CAS 413, which was promulgated in 1977 and became effective in 1978. 42 Fed.Reg. 37,191, 37,196 (Jul. 20, 1977). References herein to "CAS 413" are to the original CAS 413 unless otherwise noted.

2. On August 9, 2001, in the first decision, the court granted-in-part and denied-in-part the parties' cross-motions for partial summary judgment, incorporating the reasoning set forth in *Teledyne, Inc. v. United States*, 50 Fed.Cl. 155 (2001), *aff'd sub nom. Allegheny Teledyne, Inc. v. United States*, 316 F.3d 1366 (Fed.Cir.2003), *cert. denied sub nom. General Motors Corp. v. United States*, 540 U.S. 1068, 124 S.Ct. 804, 157 L.Ed.2d 732 (2003). Order Granting–In–Part and Deny-ing–In–Part the Parties' Cross–Motions for Par-tial Summary Judgment, *Gen. Elec. Co. v. United States*, No. 99–172C (Fed.Cl. Aug. 9, 2001). On May 27, 2004, in the second decision, the court

granted the government's motion for partial sum-mary judgment and denied GE's motion for par-tial summary judgment on the parties' interpreta-tions of their obligations under the GE Advance Agreement. *Gen. Elec. Co. v. United States*, 60 Fed.Cl. 782 (2004). On September 29, 2008, in the third decision, the court granted-in-part and denied-in-part the parties' cross-motions for summary judgment on the issue of whether the plaintiff's transfer of a net pension surplus satis-fied its segment closing obligations under CAS 413. Order Granting–In–Part and Denying–In–Part the Parties' Cross–Motions for Partial Sum-mary Judgment, *Gen. Elec. Co. v. United States*, 84 Fed.Cl. 129 (2008).

3. In *General Motors Corp. v. U.S.*, 78 Fed.Cl. 336 (2007) ("*GM*"), another CAS 413 case, the court held that the actuarial assumptions used by the contractor under CAS 412 must be used for the CAS 413 segment-closing adjustment. These cross-motions focus on what the proper CAS 412 rate should be when the contractor has an over-funded pension plan.

sion plan subject to the minimum funding requirements of ERISA.

In 1993, GE sold its GEA business to Martin Marietta. GE's sale of GEA constituted a segment closing under the version of CAS 413 that was promulgated by the Cost Accounting Standards Board ("CASB" or "CAS Board") in 1977 and which was in effect at the time of the GE segment closing.

The original CAS 413.50(c)(12) states, in relevant part, that when a segment is closed, the contractor "shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated." 42 Fed.Reg. at 37,198. In order to make this calculation, an interest rate must be used to discount the pension liabilities to present value.

For purposes of the CAS 413.50(c)(12) segment-closing calculation, a contractor is required to use an interest rate assumption that is properly arrived at and represents, as required by CAS 412.40(b)(2), the contractor's "best estimate[ ]" of future earnings under the plan.[4] CAS 412.40(b)(2), 48 C.F.R. § 9904.412–40(b)(2) (1993). CAS 412.40(b)(2) states, in relevant part, that "[e]ach actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations." *Id.* Furthermore, during the time period at issue in this case, CAS 412.50(b)(5) stated, in relevant part, that "[A]ctuarial assumptions should reflect long-term trends so as to avoid distortions caused by short-term fluctuations." 48 C.F.R. § 9904.412–50(b)(5) (1992).

It is not disputed that CAS 412 was promulgated, in part, because of changes to the funding standards mandated by ERISA.[5] It is also undisputed that the requirements for setting interest rates under ERISA and CAS 412 are virtually identical. Thus, under ERISA, "all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods ... [that take] into account the experience of the plan and reasonable expectations, ... [and] the actuary's best estimate of anticipated experience under the plan." 26 U.S.C. § 412(c)(3) (2006).

At the time of the GE segment closing, in 1993, GE made the same interest rate assumptions for ERISA and CAS 412. For purposes of ERISA, an enrolled actuary set the rate. For purposes of CAS 412, GE adopted the actuary's ERISA rate as its own. Under CAS 412 the contractor has the ultimate responsibility for setting the interest rate assumption. CAS 412.40(b)(2). It is not disputed that, in most cases, government contractors have used the actuary-set ERISA interest rate for CAS 412 purposes.

In addition to making interest rate assumptions for ERISA and CAS purposes, GE has also had to make interest rate assumptions for financial accounting purposes. In 1975, when CAS 412 and 413 were promulgated, the financial accounting of pension costs was subject to the requirements of Accounting Principles Board Opinion No. 8 ("APB–8"), which was adopted in 1966. Under APB–8, the interest rate used in an actuarial valuation was required to be "an expression of the average rate of earnings

---

4. Because most pension benefits will not be paid for many years, pension expenses and benefits are computed based on assumptions about future interest rates, estimates of annual increases in compensation levels, and expected rates of return on plan assets.

5. For example, Prefatory Comment 1 of Preamble A to CAS 412 states:
   The Board received a variety of comments relative to the relationship between the proposed Standard, the Employee Retirement Income Security Act of 1974 (ERISA) and generally accepted accounting principles set forth in

"Accounting for the Cost of Pension Plans," Opinion No. 8 by the Accounting Principles Board.... *ERISA establishes, among other things, minimum funding standards for pension plans and provisions affecting deductibility of pension costs for tax purposes.... The Board believes that a requirement of law for annual minimum funding of pension costs on an irrevocable basis[ ] is strong evidence that an obligation for at least that amount has been incurred for each such period.*
   40 Fed.Reg. 43,873, Pt. 412, Preamble A (Sept. 24, 1975) (emphasis added).

that can be expected on the funds invested or to be invested to provide for the future benefits." APB–8, App. A.

As noted above (*see* n. 5), APB–8 was also specifically referenced in Prefatory Comment 1 to the original CAS 412. The Prefatory Comment stated that the CAS Board did not believe that some of the financial accounting requirements in APB–8 would be appropriate for CAS purposes. Specifically, the CAS Board stated, "APB–8 provides criteria for accounting for the cost of pension plans for financial accounting purposes. The Board believes that certain of these criteria are not appropriate for Government contract costing purposes." 42 Fed.Reg. 37,192 (July 20, 1977). The CAS Board also noted that the Financial Accounting Standards Board ("FASB") was reevaluating APB–8, but that "any such changes would be directed to external financial [accounting and] reporting and would not necessarily impact contract costing." *Id.* The CAS Board went on to say that it would review changes proposed by both the FASB and the legislative and regulatory bodies responsible for implementing ERISA and that it would "make whatever revisions to the Standard it deems appropriate for contract costing purposes." *Id.*

The FASB in fact changed the financial accounting rules for pensions in 1985 with the adoption of FAS 87. FAS 87 made significant changes to APB–8 and established several new requirements for the financial reporting of pensions. Most importantly, under FAS 87, there are now two different interest rate assumptions: the "expected long-term rate of return on plan assets" ("LTR") and the "discount rate[ ]." FAS 87 Paras. 44, 45. Under FAS 87, the LTR is to reflect "the average rate of earnings expected on the funds invested or to be invested for the benefits included in the projected benefit obligation. In estimating that rate, appropriate consideration should be given to the returns being earned by the plan assets in the fund and the rates of return expected to be available for reinvestment." *Id.* at Para. 45. The "discount rates" in contrast "shall reflect

the rates at which pension benefits could be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to effect settlement of the obligation...." *Id.* at Para. 44.

In 1993, actuaries for GE selected an 8% assumption for ERISA purposes, which the contractor adopted for CAS 412 purposes, and an interest rate assumption of 9.5% for FAS 87 LTR purposes.

### B. The Parties' Experts

In support of their summary judgment motions, GE and the government offered the declarations and testimony of various experts to explain the actuarial and accounting science and policy behind the various interest rate assumptions used under ERISA, CAS and FAS 87.[6] GE offered the declarations of Thomas S. Terry and William T. Keevan. The government offered the declarations and testimony of Richard Daskais.

The expert evidence may be summarized as follows: first, GE offered the expert opinion of Thomas S. Terry, a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a Member of the American Academy of Actuaries, and an Enrolled Actuary under ERISA. He is the President of the Conference of Consulting Actuaries and was, at the time of his testimony, a Managing Director of JP Morgan. It was his opinion that most companies have used the same interest rate for both ERISA and CAS 412 because the interest rate assumptions under ERISA and CAS 412 are fully consistent with each other. He further opined that for most companies the CAS 412/ERISA rates and the FAS 87 LTR have been different because the FAS 87 LTR serves different purposes than the CAS 412/ERISA rates. He explained that among all industry groups, there has been a 1–1.5% gap between the CAS 412/ERISA rates and the FAS 87 LTR during the time period at

---

6. As in the *GM* case, the court accepted the expert declarations and testimony for the sole purpose of understanding the technical differences among the various interest rate assump-

tions used by the contractor in this case. *See General Motors Corp. v. U.S.*, 78 Fed.Cl. 336, 338 (2007).

issue in this case. In support of his opinion, Mr. Terry presented a copy of the uncontested Watson Wyatt Report showing a 1% to 1.5% difference between the ERISA and FAS 87 LTR for the public companies surveyed between 1986 and 1994. Hearing Tr. at 64:13–65:7 (Apr. 24, 2008).

Mr. Terry explained that there are three major differences between the CAS 412/ERISA rate and the FAS 87 LTR, which account for the disparity between the two rates. First, the FAS 87 LTR is not focused on past experience, but on a shorter period of years than CAS 412 and ERISA. Mr. Terry noted that CAS 412 and ERISA emphasize "past experience," whereas FAS 87 emphasizes "returns being earned" and "current returns." Hearing Tr. at 63:8–13. Second, he testified that the FAS 87 LTR is not tied to pension funding, whereas the CAS 412 and ERISA rates are tied to pension funding. Mr. Terry noted that in the Preamble to CAS 412, the CAS Board explained that the ERISA requirement for annual funding "is strong evidence that an obligation for at least that amount has been incurred" for cost purposes. Hearing Tr. at 35:10–13 (*quoting* 40 Fed.Reg. 43,873, Pt. 412, Preamble A). In contrast, the CAS Board noted that under APB–8, the financial accounting for pension costs is not necessarily tied to funding. Mr. Terry noted that this is confirmed by FAS 87 Para. 81, which states "the Statement reaffirms the APB–8 conclusion that funding decisions should not necessarily be used as the basis for accounting recognition of cost." Third, the CAS 412 and ERISA interest rates are used to discount long-term liabilities, whereas the FAS 87 LTR is not.

GE also introduced the testimony of Mr. William T. Keevan, a Certified Public Accountant who, at the time of his testimony, was Senior Managing Director of Navigant Consulting, Inc. Mr. Keevan has 35 years of experience as an accountant with a focus on government contracts. He has served as a member of the American Institute of Certified Public Accountants and prepared the Audit and Accounting Guide, *Audits of Federal Government Contractors.* Mr. Keevan testified that in his experience, accountants use the ERISA interest rate for CAS 412

regardless of whether the pension plan is over-or under-funded. He further testified that accountants recognize that FAS 87 and CAS 412 use different interest rate assumptions and that under guidance from the Defense Contract Audit Agency, accountants do not rely on FAS 87 for CAS 412 purposes. *See* Defense Contract Audit Agency Contract Audit Manual Sec. 7–607.1 (Sept. 10, 2008) ("The mechanics and formula for the calculation of pension cost under [FAS 87] are different from those now permitted for contract costing purposes under CAS 412 and 413. Accordingly, just because a plan is in compliance with [FAS 87] does not mean that it is in compliance with CAS 412 and 413.").

To respond to GE's experts, the government presented the opinion testimony of Richard Daskais, a Fellow in the Society of Actuaries since 1955 and a pension actuary for more than 50 years. Mr. Daskais opined that when a pension plan is fully funded, the best estimate of future earnings required by both CAS 412 and FAS 87 should be "virtually identical." Hearing Tr. at 193:16–17. Mr. Daskais explained that the goal of the interest rate assumption is to estimate the future earnings on plan assets so that future funding, together with current plan assets, will be sufficient to pay all future benefits over the life of the plan. Mr. Daskais agreed that the CAS 412 and ERISA standards for setting the interest rate assumption are the same. However, he went on to explain that the FAS 87 LTR should also be the same as the CAS 412 and ERISA rates when a plan is overfunded. According to Mr. Daskais, all of these standards require the use of "best estimates" of future investment earnings. *Id.* at 189:14–15. Most importantly, however, Mr. Daskais testified that CAS 412 and FAS 87, in contrast to ERISA, do not require that rates be set by an "enrolled actuary." *Id.* at 207:5–8. He explained that CAS 412 and FAS 87 require that the "best estimate" be set by the "contractor." *Id.* at 207:20–208:2. Mr. Daskais explained that while the contractor can adopt the "best estimate" of the actuary undertaken under ERISA for CAS 412 and FAS 87 purposes, the contractor is not obligated to do so. Id. at 207:20–23, 214:25–215:3. Rather, Mr. Daskais explained that the CAS 412 rate and the FAS 87 LTR

estimate must reflect the *contractor's* "best estimate" and because they both involve "rates of return" the contractor should use the same number for both. *Id.* at 207:20–208:2. Mr. Daskais rejected the notion that any differences could be ascribed to the fact that the FAS 87 LTR serves a different purpose from CAS 412. He did not think the fact that the FAS 87 LTR is not tied to pension funding or the fact that FAS 87 requires the use of a different discount rate should make any difference for CAS 412 purposes. Mr. Daskais also rejected the notion that FAS 87 and CAS 412 place a different emphasis on "past experience" in setting the interest rate. Mr. Daskais did not believe that ERISA required actuaries to take a longer view than the rate authorized under FAS 87 LTR. Mr. Daskais went on to explain that in his opinion GE's 9.5% FAS 87 LTR was an appropriate best estimate for both FAS 87 LTR and CAS 412 purposes. *Id.* at 216:10–16.

## C. Proceedings Below

Following briefing, a hearing of the experts was held on April 24, 2008. Post-hearing briefs were submitted on May 21, 2008. Oral argument on the parties' motions was held on October 17, 2008.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rules of the Court of Federal Claims ("RCFC") 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l*, 157 F.3d 1311, 1316 (Fed.Cir. 1998). Here, the principal issue on summary judgment is whether GE was required to adopt the FAS 87 LTR for CAS 412 purposes as a matter of law. This requires an interpretation of CAS 412, which is a question of law, and thus it is appropriate for summary judgment. *See Rumsfeld v. Unit-*

*ed Techs. Corp.*, 315 F.3d at 1369 ("[T]he interpretation of CAS [ ] is an issue of law, not an issue of fact, as we have made clear in our prior decisions."); *Billings v. United States*, 322 F.3d 1328, 1332 (Fed.Cir.2003) ("The underlying issue, one of statutory and regulatory construction, is a question of law...."); *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995) (In the context of interpreting FAR provisions that were intended to implement the CAS, stating: "The interpretation of regulations incorporated into a contract is purely a legal question." (citations omitted)), *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed.Cir. 1999).

### B. The Criteria Used for Setting the CAS 412 Interest Rate Assumption and the Purposes for Which CAS 412 Are Used Are Different From the FAS 87 LTR.

#### 1. The Criteria for Setting the CAS 412 Rate Are Different from the FAS 87 LTR criteria.

Both parties agree that the CAS 412 rate must be used for purposes of the CAS 413 segment-closing adjustment ultimately at issue in this case. In this motion, the primary dispute between the parties concerns the extent to which the criteria used to set the CAS 412 rate and the FAS 87 LTR are the same or different. The government contends that the criteria for setting both rates are the same, and therefore GE is bound by its FAS 87 LTR determination when performing the CAS 413 segment-closing adjustment. GE contends that the criteria for setting the CAS 412 rate are different from those required under FAS 87, and therefore GE was not legally required to adopt the same rate for CAS 412 as it did for its FAS 87 LTR.

In determining whether GE should be required to use its FAS 87 LTR for CAS 412 purposes, the court begins with the text of CAS 412 and its regulatory history. CAS 412, which was promulgated in 1975, was designed "to provide guidance for determining and measuring the components of pension cost .... [and it] establish[ed] the basis on which pension costs shall be assigned to

cost accounting periods." CAS 412.20, 48 C.F.R. § 9904.412–20 (1993). In the regulation, the CAS Board provided guidance regarding the actuarial assumptions that could be used to calculate pension costs. In the requirements section of the regulation, the CAS Board provided: "Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's *best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations.*" CAS 412.40(b)(2) (emphasis added). The CAS Board also provided that *"[a]ctuarial assumptions should reflect long-term trends so as to avoid distortions caused by short-term fluctuations."* CAS 412.50(b)(5) (emphasis added).

The regulatory history accompanying CAS 412 explains the choices the CAS Board made in considering its regulatory options. As part of that history, the CAS Board explained its position on the relationship between CAS 412 and ERISA, as well as CAS 412 and the generally accepted accounting principles set forth in APB–8, the predecessor to FAS 87. In its promulgation comments, the CAS Board explained that CAS 412 was intended to fill in gaps not established by ERISA and to identify the differences between the "financial" accounting of pensions and the "cost" accounting of pensions. For example, the promulgation comments state that "ERISA does not provide for the measurement of pension costs for assignment among cost accounting periods or for the subsequent allocation of such costs to contracts. Accordingly, CAS 412 contains requirements not contained in ERISA to accomplish these purposes." 40 Fed.Reg. 43,-873, Pt. 412, Preamble A. The CAS Board also stated in the promulgation comments that the financial accounting of pension costs and the cost accounting of pension costs serve different purposes and therefore financial accounting principles are not necessarily applicable to cost accounting. The promulgation comments explain:

APB–8 provides criteria for accounting for the cost of pension plans for financial accounting purposes. The Board believes that certain of these criteria are not appropriate for Government contract costing purposes. For example, a fundamental concept of APB–8 is that the annual pension cost to be charged to expenses for financial accounting purposes is not necessarily determined by the funding of the pension plan. The Board believes that a requirement of law for annual minimum funding of pension costs on an irrevocable basis [under ERISA] is strong evidence that an obligation for at least [that amount has been incurred for each] such period.

*Id.*

Finally, the Board explained that changes in ERISA or in the Financial Accounting Standards would not necessarily result in changes to CAS 412. The Board stated that:

[It] recognizes that in the FASB's reconsideration of APB–8, the FASB could make significant changes in the manner in which pension costs are to be treated for financial accounting purposes ... However, any such changes would be directed to external financial reporting and would not necessarily impact contract costing.... The Board maintains constant liaison with the FASB ... [and] with the legislative and regulatory bodies responsible for developing and administering ERISA. The Board will review whatever pronouncements these bodies may issue and will make whatever revisions to [CAS 412] it deems appropriate for contract costing purposes.

*Id.*

Based on the plain language of CAS 412 and its regulatory history, the court agrees with GE regarding the relationship between FAS 87 LTR and CAS 412 and concludes that the criteria used for setting CAS 412 actuarial interest rate assumptions are different from the criteria used for setting interest rate assumptions under FAS 87. Accordingly, the court holds that GE's decision not to use the FAS 87 LTR for CAS 412 purposes but to adopt its ERISA interest rate assumption was proper.

It is plain from the language of CAS 412 that contractors are expected to use different assumptions for CAS 412 purposes than they are to use for FAS 87 LTR purposes. CAS 412 actuarial assumptions are to be devel-

oped based on the contractor's "past experience" as well as "reasonable expectations" for the future. CAS 412.40(b)(2). The interest rate assumption for the FAS 87 LTR, in contrast, is to be developed based on "the returns *being* earned by the plan assets in the fund and the rates of return expected to be available for reinvestment." FAS 87 para. 45 (emphasis added). Thus, the focus of the FAS 87 LTR determination is plainly on the plan's *current* returns as opposed to rates that were obtained in the past. While it is true, as the government contends, that nothing in FAS 87 bars consideration of past returns, it is equally true that, unlike CAS 412, the FAS 87 LTR is not focused on "past experience."

The difference in focus between setting the CAS 412 rate and the FAS 87 LTR is reflected in the Watson Wyatt Report, a survey of companies with defined pension benefit plans submitted by GE. Hearing Tr. at 64:13–65:7. The survey shows that the CAS 412 interest rate assumptions adopted by hundreds of companies were uniformly 1–1.5 percentage points lower than the FAS 87 LTR they selected for the same time period (1986–1994). *Id.* The only credible reason for this difference was offered by Mr. Terry, who explained that "CAS 412 emphasizes past experience where that's not the case in the FAS [87] rate. Instead, the FAS [87] rate [is really based on] current returns, . . . returns being earned by the plan assets." Hearing Tr. at 63:8–13.[7] Indeed, under CAS 412.50(b)(5), the CAS 412 rate must avoid distortions caused by "short-term fluctuations" in the market, such as those that might be reflected in the FAS 87 rate.

For all of the above-cited reasons, the criteria for setting the CAS 412 rate and the FAS 87 LTR are plainly different.

**2. CAS 412 Is Used for Different Purposes than the FAS 87 LTR.**

Not only is the CAS 412 rate based on criteria different from those on which the FAS 87 LTR is based, but the court also agrees with GE that the CAS 412 rate is used for different purposes than the FAS 87 LTR and that therefore the FAS 87 LTR and the CAS 412 rate need not be the same.

First, as discussed above, the CAS 412 rate is designed to discount pension liabilities to present value, whereas the FAS 87 LTR is not. Under the financial accounting rules, a separate discount rate is used for pension liability discounting purposes. The discount rate required by FAS 87 is not tied to a company's expected rate of return, but is instead based on the interest rate that would be needed to "settle" the company's pension liabilities. The FAS 87 discount rate is far lower than the FAS 87 LTR or the CAS 412 rate and neither party advocates its use.[8]

Moreover, the reason for the two FAS 87 rates also helps to explain why the FAS 87 LTR and the CAS 412 rate will not be the same. In contrast to the CAS 412 and ERISA rates, the FAS 87 LTR is not concerned with protecting the health of the pension fund but is instead concerned with giving investors and lenders an understanding of a company's *current* profits. By contrast, the FAS 87 LTR is used to judge the company's corporate earnings for a year. The long term risk to the company based on its pension liability is reflected in the separate "discount rate." The FAS 87 discount rate will give those same investors and lenders a picture of the company's potential pension liability in the event the plan does not make the earnings it expects. The FAS 87 rates are therefore tied to investment decisions and not pension decisions.[9] In such circum-

---

7. This view is confirmed by the Defense Contract Audit Agency Contract Audit Manual Sec. 7–607.1 ("The mechanics and formula for the calculation of pension cost under [FAS 87] are different from those now permitted for contract costing purposes under CAS 412 and 413. Accordingly, just because a plan is in compliance with [FAS 87] does not mean that it is in compliance with CAS 412 and 413.").

8. In *GM,* the court rejected GM's efforts to use an interest rate based on "settling pension liabilities" for CAS 412 purposes. 78 Fed.Cl. at 338.

9. See FAS 87 at 7:
   The [Financial Accounting Standards] Board believes that users of financial reports need information beyond that previously disclosed *to be able to assess the status of an employer's pension arrangements and their effects on the employer's financial position* and results of op-

stances, it is logical that a company's "best estimate" for its FAS 87 LTR would be different from the best estimate the company makes for CAS 412 and ERISA.

Similarly, in contrast to the FAS 87 LTR, the CAS 412 and ERISA rates are tied to pension funding decisions. As the government's expert, Mr. Daskais, recognized, the reason that the ERISA and CAS 412 rates are the same is because it is the decision to fund the pension plan under ERISA that triggers the cost reimbursement obligation under the CAS. If the two are separate and the contractor is required to pay into the pension fund under ERISA, but is not able to immediately recoup its pension cost from the government, there will be a disconnect between the pension payment and cost reimbursement, a result contrary to the CASB's intent. *See* 40 Fed.Reg. 43,873, Pt. 412, Preamble A ("The purpose of the [CAS] Board in promulgating this Standard is to establish the accounting bases for measuring the proper amount of pension cost to be assigned to cost accounting periods for subsequent allocation to negotiated Government contracts."). Indeed, Mr. Daskais explained that if a "contractor chooses a CAS 412 rate that is higher than the ERISA rate .... the contractor ... will most likely have to make contributions that are in excess of its CAS costs and those contributions will be carried forward as pre-payments and will not be currently reimbursable." Hearing Tr. at 214: 7–14. Clearly, because the CAS 412

rate is tied to ERISA funding decisions, it serves a different purpose from the FAS 87 LTR.

In sum, the different uses of the CAS 412 rate and the FAS 87 LTR explain why a company would have a different CAS 412 rate and FAS 87 LTR back in 1993, as GE did. The court rejects the government's contention that a contractor with different "best estimates" for different rates is behaving inconsistently. To the contrary, the court finds that contractors would likely have two different "best estimates" of pension asset returns, depending upon the criteria and uses of the estimate.[10] Accordingly, the court rejects the government's contention that the CAS 412 rate and the FAS 87 LTR must be the same as a matter of law.

### CONCLUSION

For the foregoing reasons, the court **GRANTS** GE's motion for partial summary judgment and **DENIES** the government's motion for partial summary judgment.

**IT IS SO ORDERED.**

---

erations.... [T]his Statement requires certain disclosures not previously required.

This Statement requires disclosure of the components of net pension cost and of the projected benefit obligation. One of the factors that has made pension information difficult to understand is that past practice and terminology combined elements that are different in substance and effect into net amounts. Although the Board agreed to retain from past pension accounting practice the basic features of reporting net cost and offsetting liabilities and assets, the Board believes that disclosure of the components will significantly assist users in understanding the economic events that have occurred. Those disclosures also make it easier to understand why reported amounts change from period to period, especially when a large cost or asset is offset by a large revenue or liability to produce a relatively small net reported amount.

(Emphasis added.)

10. The government's reliance on Prefatory Comment Five of the Preamble to CAS 412 for the proposition that a contractor "can't subcontract [its] discretion with respect to setting assumptions out to the plan's actuary" is misplaced. Tr. of Oral Arg. 36:21–23 (Oct. 17, 2008). The reason that the company signs off on the CAS 412 rate is that the contractor, not the actuary, bears ultimate responsibility for the rate. *See* 40 Fed. Reg. 43,873, Pt. 412, Preamble A (Sept. 24, 1975) ("[C]ontract terms are not imposed on actuaries; rather, it is the contractors who are parties to contracts with the Government and must bear the responsibility for compliance with the terms thereof."). Thus, Prefatory Comment Five does not suggest that the contractor must use the same "best estimate" for both CAS 412 and FAS 87 LTR purposes simply because the contractor is responsible for both rates.